COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-06-180-CV

 

 

IN THE INTEREST OF                                                                            

B.C. AND O.C., CHILDREN

 

                                                                                                        

 

                                              ------------

 

           FROM THE 325TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

Appellants Anna C. and David Jason Worthington (AJason@) appeal
the trial court=s order terminating their
parental rights to Anna=s son, B.C., and Anna and Jason=s
daughter, O.C.  They each raise three
issues challenging the legal and factual sufficiency of the evidence supporting
the grounds for termination and the trial court=s
findings that termination was in the children=s best
interests.  We affirm.








BACKGROUND

Anna=s son,
B.C., was born August 15, 2003.[2]  Jason and Anna met a few months later and
were living together by March 2004.  On
Saturday, November 6, 2004, Lydia Martinez, a relative of Anna,[3]
went to Jason and Anna=s apartment to pick up B.C. and
saw bruises on B.C.=s body.  Both Lydia and her husband, Juan, testified
that they had begun to see fingerprints on B.C=s face a
few months earlier.  Lydia testified that
when she asked Jason about the bruises, he replied that if he had Adone it,@ the
bruising would have been worse.  Juan
called police and then also confronted Jason about the bruising; according to
Lydia, Jason told Juan, AOkay, okay, I admit it.  I did it.@  Juan testified that Jason said he caused B.C.=s
injuries because he wanted to Amake the
baby tougher.@ 








Thereafter, Juan, Lydia, and Anna, who was
pregnant at the time, took B.C. to the emergency room.  According to the emergency room doctor=s
affidavit, B.C. was diagnosed with Amultiple
ecchymoses@[4]
involving his face, arms, chest, and legs. 
The doctor=s affidavit reported that the
bruising pattern on B.C.=s face was Aconsistent
with a hand slap mark and/or squeezing of the face.@  The other bruises were in atypical locations
for a toddler, leading the doctor to conclude that the injuries appeared
consistent with blunt force trauma in a non-accidental pattern.  The doctor also noted that B.C. had a tongue
injury that was caused by forceful penetration of the mouth by an object such
as a bottle, spoon, or finger.  Finally,
the doctor observed that B.C. had apparently suffered progressively worse
injuries over the preceding few days and concluded, AI fear
the ultimate injury may occur that could lead to his demise.@








After receiving a report of possible abuse of a
child, CPS investigator Norma Wolf responded to the hospital that same evening
to assess B.C.=s situation.  Wolf testified that she observed bruises on
B.C.=s face,
head, ears, thighs, and arms.  Wolf
further testified that she asked Anna about B.C.=s
bruises, and Anna responded that she had seen Jason hit the child on an ongoing
basis.  Anna also said that Jason had
been physically and emotionally abusive to her as well.  Wolf testified that it was obvious to her
that Anna knew that Jason had injured B.C. Anot just
once, probably several times over a long period,@ because
B.C.=s
injuries were in various stages of healing. 
Nevertheless, Anna continued to leave B.C. with Jason whenever she went
to work.  Wolf testified that she told
Anna never to let Jason care for B.C. again because it would not be safe.  Wolf further testified that her discussion
with Anna indicated to her that Anna could not be protective of B.C. 








Sergeant Steve Benjamin, a police officer who
also responded to the hospital to investigate the allegations of abuse,
testified that he interviewed Anna that same night and that she provided a
written statement about B.C.=s
injuries.  In the statement, Anna
reported that she had seen Jason slap B.C.=s leg
and face, punch B.C. in the face with his fist, pull B.C.=s hair,
and squeeze B.C. until he cried.  Anna
stated that Jason had also hit her at least twice with an open hand and fist
because she had gotten mad at him for not having a job and for the way he
treated B.C.  Anna stated that she had
noticed the marks on B.C.=s face three days earlier, when
B.C. woke up in the morning after having spent the prior evening alone with
Jason.  When Anna confronted Jason about
the marks on B.C.=s face, Jason told her that B.C.
had fallen while playing outside.  Anna
told Jason that Athose weren=t
falling down marks@ and accused Jason of hitting
B.C., but Jason continued to deny hitting B.C., and Anna did not actually see
Jason hit the child because she was at work while Jason babysat him.

Based on the results of the investigation, CPS
removed B.C. from Anna=s custody that night and placed
him in foster care.  Jason was charged
with felony injury to a child with intent to cause bodily injury, to which he
pleaded guilty and received ten years=
deferred adjudication community supervision. Anna gave birth to a girl, O.C.,
on January 18, 2005; CPS also removed her and placed her first with the
Martinezes and then in foster care.  This
case came to trial in May 2006.

At trial, both Anna and Jason gave testimony that
was contrary to their prior admissions. 
Anna testified that she had lied to the police about Jason=s
abusing her and B.C. because she was scared that she might lose her son or go
to jail.  Jason testified that he had
caused only one bruise on B.C.=s left
leg and that someone else must have caused B.C.=s other
injuries.  He denied admitting to Juan
that he caused B.C.=s bruises.








After hearing all the evidence, the trial court
signed an order finding that termination of the parent-child relationship was
in the best interests of the children and terminating Anna=s
parental rights to B.C. and O.C. and Jason=s
parental rights to O.C.  The order
contains the trial court=s findings that Anna (1)
knowingly placed or knowingly allowed the children to remain in conditions or
surroundings which endanger the physical or emotional well-being of the
children and (2) knowingly placed the children with persons who engaged in
conduct which endangers the physical or emotional well-being of the
children.  The order also contained the
trial court=s findings that Jason (1)
knowingly placed or knowingly allowed O.C. to remain in conditions or
surroundings which endanger the physical or emotional well-being of the child
and (2) engaged in conduct or knowingly placed O.C. with persons who engaged in
conduct which endangers the physical or emotional well-being of the child.  Anna and Jason each challenge these findings
on appeal.

DISCUSSION

A.     Grounds for termination of Anna=s
parental rights to B.C. and O.C.

In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the petitioner
must establish one ground listed under subdivision (1) of the statute and must
also prove that termination is in the best interest of the child.  TEX. FAM. CODE ANN. ' 161.001
(Vernon Supp. 2006); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987). 








In her first two of three issues on appeal, Anna
asserts that the evidence is legally and factually insufficient to support the
trial court=s findings that she knowingly
placed or knowingly allowed the children to remain in conditions or
surroundings which endangered the physical or emotional well-being of the
children and that she knowingly placed the children with persons who engaged in
conduct which endangered the physical or emotional well-being of the
children.  See Tex. Fam. Code Ann. '
161.001(1)(D)B(E).  Anna argues that the evidence was
insufficient to show that she knew that leaving B.C. with Jason would endanger
the child.  We disagree.








AEndanger@ means
to expose to loss or injury, to jeopardize. 
In re M.C., 917 S.W.2d 268, 269 (Tex. 1996).  Conduct of a person in the home can create an
environment that endangers the physical and emotional well‑being of a
child under subsection (D).  See In re
W.S., 899 S.W.2d 772, 776 (Tex. App.CFort
Worth 1995, no writ).  For example,
abusive or violent conduct by a parent or other resident of a child=s home
may produce an environment that endangers the physical or emotional well‑being
of a child.  See id. at 776‑77;  Ziegler v. Tarrant County Child Welfare
Unit, 680 S.W.2d 674, 678 (Tex. App.CFort
Worth 1984, writ ref=d n.r.e.).  Under subsection (E), the endangerment of the
child=s well‑being
must be the direct result of the parent=s
conduct, including acts, omissions, or failures to act.  In re J.T.G., 121 S.W.3d 117, 125
(Tex. App.CFort Worth 2003, no pet.).  Additionally, termination under subsection
(E) must be based on more than a single act or omission; a voluntary,
deliberate, and conscious course of conduct by the parent is required.  Id.

Ample evidence was presented that the domestic
violence between Jason and Anna, as well as ongoing violence against B.C.
himself, created an endangering environment for B.C. in the home.  Lydia testified that Anna told Lydia in 2004 that
Jason was hurting her, and she also told Lydia that Jason had bitten her on the
cheek.  Based on B.C=s
injuries, the ER doctor concluded that B.C. had suffered progressively worse
injuries over the few days preceding his visit to the ER.  The CPS worker who responded to the hospital
also testified that Anna told her she had seen Jason hit B.C. on an ongoing
basis.  Anna herself told police that
Jason had hit her at least twice with an open hand and fist and that she had
seen Jason slap B.C.=s leg and face, punch B.C. in
the face with his fist, and pull B.C.=s hair
and squeeze him until he cried. Anna also admitted at trial that she saw
bruising on B.C.=s leg the morning of the day
that B.C. was taken to the hospital and that she was concerned for the child=s
safety, but she nevertheless left B.C. with Jason while she went to work. 








In reviewing the evidence for legal sufficiency
in parental termination cases, we must determine whether the evidence is such
that a fact-finder could reasonably form a firm belief or conviction that the
grounds for termination were proven.  In
re J.F.C., 96 S.W.3d 256, 265S66 (Tex.
2002).  We must review all the evidence
in the light most favorable to the finding and judgment.  Id. at 266.  This means that we must assume that the
fact-finder resolved any disputed facts in favor of its finding if a reasonable
fact-finder could have done so.  Id.  We must also disregard all evidence that a
reasonable fact-finder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable fact-finder could, and disregard contrary evidence unless a
reasonable fact-finder could not.  City
of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).

In a factual sufficiency review, in determining
whether the evidence is such that a fact-finder could reasonably form a firm
belief or conviction that its finding was true, we must consider whether the
disputed evidence is such that a reasonable fact-finder could not have resolved
it in favor of the finding.  Id.  If, in light of the entire record, the
disputed evidence that a reasonable fact-finder could not have credited in
favor of the finding is so significant that a fact-finder could not reasonably
have formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  Id.









Anna emphasizes that she recanted her previous
statements during her trial testimony regarding Jason=s abuse
of her and B.C., but it is the fact-finder=s duty
to resolve issues of credibility; accordingly, the trial court could have
properly determined that Anna=s
recantation was not credible.  See In
re S.L., 188 S.W.3d 388, 394 (Tex. App.CDallas
2006, no pet.); see also Golden Eagle Archery, Inc. v. Jackson, 116
S.W.3d 757, 761 (Tex. 2003) (stating that the fact-finder Ais the
sole judge of the credibility of witnesses and the weight to be given to their
testimony@).  








Anna also points to the absence of evidence such
as prior police reports of family violence or a medical diagnosis of prior
physical abuse to contend that the evidence is insufficient to support the
trial court=s findings.  However, there was ample evidence from other
sources, including Anna herself, of ongoing abuse suffered by Anna and B.C. at
Jason=s hand;
but despite this ongoing abuse, Anna continued to leave B.C. in Jason=s
care.  Having reviewed the record, we
conclude that the evidence is legally and factually sufficient to support the
challenged endangerment findings.[5]  See Tex.
Fam. Code Ann. ' 161.001(1)(D)S(E); In
re J.F.C., 96 S.W.3d at 265S66.  We overrule Anna=s first
two issues.

B.     Grounds for termination of Jason=s
parental rights to O.C.

In his first two issues, Jason asserts that the
evidence is legally and factually insufficient to support the trial court=s
findings that he knowingly placed or knowingly allowed O.C. to remain in
conditions or surroundings which endangered her physical or emotional
well-being and that he engaged in conduct or knowingly placed O.C. with persons
who engaged in conduct which endangered her physical or emotional well-being.[6]  Because CPS took O.C. into custody at birth,
Jason argues, he never had possession of the child to perform any act having to
do with endangering her well-being.  








However, as previously stated, a parent=s
conduct with regard to the other parent or children can be used to support a
finding of endangerment even against a child who was not yet born at the time
of the conduct.  See In re W.J.H.,
111 S.W.3d at 716; In re D.T., 34 S.W.3d at 636S37.  Jason contends that the evidence is
insufficient because evidence about almost every fact relating to his causing
B.C.=s injury
was controverted; however, it was the province of the trial court, as the
fact-finder, to resolve conflicts within the evidence.  See In re T.N., 180 S.W.3d 376, 382S83 (Tex.
App.CAmarillo
2005, no pet.).  The trial court could
have freely chosen to believe all, part, or none of the testimony espoused by
any particular witness.  Id.; see
also In re R.W., 129 S.W.3d 732, 742 (Tex. App.CFort
Worth 2004, pet. denied) (stating that the fact-finder=s
function Ais to judge the credibility of
the witnesses, assign the weight to be given their testimony, and resolve any
conflicts or inconsistencies in the testimonyA). 








With regard to his treatment of B.C., Jason
argues that the trial court should not have terminated his parental rights
based upon Athis one occurrence.A  Certainly, under the grounds contained in
subsection (E)Cengaging in conduct or knowingly
placing the child with persons who engage in conduct which endanger her
physical or emotional well-beingCa
deliberate course of endangering conduct by the parent is required.  See In re J.T.G., 121 S.W.3d at
125.  The record contains much more
evidence of abuse in addition to Athis one
occurrence,A however; as detailed above,
evidence was presented of domestic violence that Jason committed against Anna
in addition to evidence showing that Jason=s abuse
of B.C. was ongoing, not simply a one-time event.  

Jason also contends that termination was
unwarranted because B.C.=s injuries were Alimited
to bruises@ and no Asignificant
injuries@ were
present. However, while the term Aendanger@ as used
in the statute means more than a threat of Ametaphysical
injury,A it is
not necessary that the child actually suffers injury so long as the child is
threatened with loss or injury or the child=s
well-being is put in jeopardy due to the parent=s
actions.  See Boyd, 727 S.W.2d at
533.  Furthermore, Jason pleaded guilty
to the charge of felony injury to a child that was brought on the basis of such
Ainsignificant@
bruising, and the ER doctor observed that B.C. had apparently suffered
progressively worse injuries over the days preceding the child=s visit
to the ER.  Accordingly, we do not agree
that the evidence is insufficient to support termination merely because B.C.
did not suffer more Asignificant@
injuries beyond the multiple bruises appearing on a large part of the
one-year-old=s body.








Finally, Jason argues that, even assuming that he
did injure B.C., the evidence is nevertheless insufficient to support
termination of his rights to O.C. because no evidence was presented that he
would have treated O.C., his biological child, in the same manner as B.C., his
stepchild.  This argument fails because a
parent=s
conduct need not be directed at the child who is the subject of the termination
proceedings or even result in injury to the child to constitute
endangerment.  See In re Baby Boy R.,
191 S.W.3d 916, 925 (Tex. App.CDallas
2006, pet. denied) (affirming trial court=s
finding that defendant=s abuse of his stepdaughter
constituted conduct that endangered the physical or emotional well‑being
of his unborn son) (citing Boyd, 727 S.W.2d at 533), cert. denied,
127 S. Ct. 729 (2006).  A parent=s
conduct toward a stepchild will suffice to support termination of another
child, even if that conduct did not occur in the child=s
presence.  Lucas v. Tex. Dep=t of
Protective & Regulatory Servs., 949 S.W.2d 500, 503 (Tex.
App.CWaco
1997, pet. denied), disapproved on other grounds by In re J.F.C., 96
S.W.3d 256 (Tex. 2002); Trevino v. Tex. Dep=t of
Protective & Regulatory Servs., 893 S.W.2d 243, 248 (Tex.
App.CAustin
1995, no writ).  

Having reviewed all the evidence, we conclude
that the trial court could have reasonably resolved the disputed facts in favor
of its finding and that the evidence is legally and factually sufficient to
support the challenged endangerment findings. 
See Tex. Fam. Code Ann.
'
161.001(1)(D)S(E); J.F.C., 96 S.W.3d at
265S66.  We overrule Jason=s first
two issues.

 

 








C.     Best Interests of the Children

In their third issues, both Anna and Jason
challenge the legal and factual sufficiency of the evidence supporting the
trial court=s finding that termination of
their parental rights was in the children=s best
interests.  First, Appellants argue that
the proposed placementCthe foster home in which both
children had lived for the past yearCwas
unstable and presented a risk of physical and emotional harm.

About two months after O.C. was born, CPS placed
her in the home of foster parent April Barlow. 
Two months later, B.C. was also placed in the Barlow home.  At the time of trial, Barlow, along with her
husband, had one ten-year-old adopted son and were in the process of adopting
two other foster children, a two-year-old girl and a three-year-old boy.  Barlow testified that she and her husband
wanted to adopt B.C. and O.C. as well.








Appellants point to B.C.=s
behavioral issues, along with those of the other children in the home, in
support of their argument that the foster home negatively affected the children=s
emotional well-being and that the foster family was not making any progress in
bonding with the children or meeting their physical and emotional needs.  Appellants claim that B.C. Abegan an
emotional free-fall@ after being placed with the
Barlows, but Barlow testified that B.C. already Awas
lashing out with anybody@ from the beginning; for
example, on his first day in the foster home, B.C. bit one of the Barlows= other
children. 

However, under the care of the Barlows, B.C. was
receiving speech, play, and occupational therapy services.  B.C. had bonded with his foster family to the
point that he called the Barlows Amom@ and Adad@ and the
other children in the home Abrothers@ and Asisters.@  O.C. as well had bonded with the foster family;
Barlow testified that, because O.C. had lived with the family since she was Alittle
bitty,@ the
Barlows were Amom and dad to her.@  O.C. was facing delays in her physical
development, but she was also receiving physical therapy, and the Barlows
worked with O.C. on a daily basis to perform exercises to improve her walking
skills.

Jason contends that he had taken advantage of
services provided by CPS to improve his parenting skills, and the record shows
that, over a year after B.C.=s
removal, Jason had just completed parenting classes and was attending anger
management classes.  However, under the
service plan developed by CPS, Jason was to complete a psychological
evaluation, undergo individual counseling, and participate in batterers=
intervention services as well; there was no evidence that he had made any
efforts to complete these services.  








As for Anna, a CPS conservatorship worker
testified that she told Anna repeatedly that to create a safe environment for
B.C., Anna needed to separate herself from Jason because he was the person who
injured B.C. and he had not completed any services since B.C.=s
removal.  Not only did Anna tell the
conservatorship worker that she would not leave Jason because she did not
believe that Jason caused B.C.=s
injuries, she also went on to marry Jason in spite of the fact that he pleaded
guilty to the charge of felony injury to a childCher son,
B.C. She later filed for divorce but admitted at trial that she never intended
to divorce Jason; instead, she initiated the divorce proceedings as a sham to
regain custody of the children.

Considering the factors that the trier of fact in
a termination case may use in determining the best interest of the child,[7]
and reviewing the entire record from the termination trial, we conclude that
the evidence is such that a fact-finder could reasonably form a firm belief or
conviction that termination of Anna=s and
Jason=s
parental rights was in the children=s best
interests; therefore, we hold that the evidence was legally and factually
sufficient to support the trial court=s best
interest findings.  See J.F.C., 96
S.W.3d at 265S66.  We overrule Anna=s and
Jason=s third
issues.

 

 








CONCLUSION

Having overruled all three of Anna=s and
Jason=s issues
on appeal, we affirm the trial court=s
judgment terminating Anna=s parental rights to B.C. and
O.C. and terminating Jason=s
parental rights to O.C.

 

PER
CURIAM       

 

PANEL F:    MCCOY,
LIVINGSTON, and DAUPHINOT, JJ.

 

DELIVERED: March 29, 2007

 











[1]See Tex. R. App. P.
47.4.   





[2]The trial court also terminated the
parental rights of B.C.=s alleged father, Manuel
Brajas.  Brajas did not appeal the trial
court=s order, and his rights are not at
issue in this appeal.





[3]Lydia Martinez and her husband,
Juan, raised Anna from the age of six because Anna=s biological mother was a cocaine
user and was living on the streets with Anna and her two sisters.  Anna=s mother was murdered when Anna was in the second or third
grade.





[4]An ecchymosis is the escape of
blood into the tissues from ruptured blood vessels marked by a black-and-blue
or purple spot or area.  Webster=s Third
New International Dictionary 718 (2002).





[5]Even though O.C. was not yet born
at the time that B.C. was endangered, a parent=s conduct with regard to the other
parent or children can be used to support a finding of endangerment even
against a child who was not yet born at the time of the conduct.  See In re W.J.H., 111 S.W.3d 707, 716
(Tex. App.CFort Worth 2003, pet. denied); see
also In re D.T., 34 S.W.3d 625, 636S37 (Tex. App.CFort Worth 2000, pet. denied) (stating that evidence of
conduct before child is born, as well as evidence as to how a parent has
treated another child or spouse, is relevant regarding whether a course of
conduct under section 161.001(1)(E) has been established). 





[6]We disagree with the State=s contention that Jason forfeited
these complaints because his statement of points of appeal was insufficiently
specific.  Jason=s statement of points specifically
challenged the legal and factual sufficiency of the evidence to support these
two findings of the trial court, which was enough to allow the trial judge to
correct any erroneous findings on the challenged grounds and to preserve these
complaints for appeal.  See In re
A.J.H., 205 S.W.3d 79, 80S81 (Tex. App.CFort Worth 2006, no pet.).





[7]See Holley v. Adams, 544 S.W.2d 367, 371S72 (Tex. 1976).